# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERESA SOLIS, an individual, on behalf of herself and all others similarly situated,<br><br>　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>TOYOTA MOTOR SALES, U.S.A., INC., a California corporation; et al.,<br><br>　　　　　　　　　　　Defendants. | Case No.: 24-cv-251-DMS-DEB<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAYING CASE** |

Pending before the Court is Defendants' Motion to Compel Arbitration. (Defendants' Motion ("Defs.' Mot."), ECF No. 27). Plaintiff filed an Opposition, (Plaintiff's Opposition ("Opp'n"), ECF No. 29), and Defendants filed a Reply, (Defendants' Reply ("Reply"), ECF No. 30). For the following reasons, the Court **GRANTS** Defendants' Motion.

## I.　BACKGROUND

Plaintiff Teresa Solis brings this class action on behalf of herself and all others similarly situated. (Plaintiff's Second Amended Class Action Complaint ("SACAC"), ECF No. 15). Plaintiff alleges that on or about October 2, 2020, Plaintiff "purchased a certified used 2019 RAV4" and Maintenance Plan "to cover [the] vehicle for five years

and/or up to 55,000 miles" from the Toyota Dealership in Santa Margarita. (*Id.* at 7). Plaintiff allegedly bought the Maintenance Plan because an employee of the Dealership represented that it would be cost-effective. (*Id.*). According to Plaintiff, Plaintiff paid more for the Maintenance Plan than she would have had she serviced her vehicle out-of-pocket. (*Id.* at 10). Further, she did not receive the full value of the Maintenance Plan because the Dealership either skipped services or performed them ahead of schedule. (*Id.*). As a result of these alleged harms, Plaintiff contends:

> Defendants devised a scheme to increase profits and retain the revenue from the Maintenance Plan by having Toyota representatives . . . (i) lie to consumers about the value of the Maintenance Plan and including them on contracts without consumers' knowledge, and/or rushing through paperwork to hide buried terms; (ii) deceive consumers who inquired about the value of the services they were receiving and why certain services were scheduled ahead of time; (iii) include services in the prepaid Maintenance Plan that were already covered by a vehicle's warranty; and (iv) not provide consumers with all of the prepaid services they purchased under the Maintenance Plan.

(*Id.* at 6).

Plaintiff's putative class action asserts six claims: (1) unjust enrichment; (2) fraud; (3) negligent misrepresentation; (4) violation of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (5) violation of the False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; and (6) breach of contract. (*Id.* at 17–23). Plaintiff's proposed nationwide class is defined as "all persons within the United States who bought a Maintenance Plan within ninety (90) days of purchasing a vehicle from Defendants at any time and at any location". (*Id.* at 10). Plaintiff also proposes two subclasses for those who bought a Maintenance Plan in California and those who bought a Maintenance Plan at the Santa Margarita Toyota Dealership. (*Id.* at 10–11).

Defendants move to enforce the Arbitration Provision included in Plaintiff's Retail Installment Sale Contract ("Sale Contract"). (Defs.' Mot. 8). The Arbitration Provision provides, in pertinent part:

> Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the arbitrability of the

claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action.

(*Id.* at Neuman Decl. Exhibit A). Plaintiff opposes the use of arbitration.

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, governs the enforcement of arbitration agreements involving interstate commerce. *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 232–33 (2013). "The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). "The FAA 'leaves no place for the exercise of discretion by the district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration has been signed.'" *Kilgore v. KeyBank, Nat. Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)). Accordingly, the Court's role under the FAA is to determine "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). If both factors are met, the Court must enforce the arbitration agreement according to its terms. Under the FAA, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

## III. DISCUSSION

### A. Arbitration of Plaintiff's Claims

#### a. Existence of Arbitration Agreement

"Although challenges to the validity of a contract with an arbitration clause are to be decided by the arbitrator, challenges to the very existence of the contract are, in general, properly directed to the court." *Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979,

983 (9th Cir. 2017) (internal citations omitted).  Since a "party cannot be required to submit to arbitration any dispute which he has not agreed so to submit", a party seeking to compel arbitration must "prov[e] the existence of an agreement to arbitrate by a preponderance of the evidence."  *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).

State contract law controls the issue of whether the parties have agreed to arbitrate. *Id.*  Under California law, "[a] contract to arbitrate will not be inferred absent a 'clear agreement.'" *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1092 (9th Cir. 2014) (quoting *Avery v. Integrated Healthcare Holdings, Inc.*, 218 Cal.App.4th 50, 59 (2013)).  A "clear agreement to arbitrate . . . may be either express or implied in fact." *Id.* (citing *Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal.4th 223, 236 (2012)).

The parties do not dispute the existence of the Sale Contract's Arbitration Provision. In fact, it is clear on the face of the Contract.  The Provision is referenced numerous times throughout the Sale Contract, most notably in its title, "**RETAIL INSTALLMENT SALE CONTRACT – SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION)**". (Defs.' Mot. Neuman Decl. Exhibit A) (emphasis in original).  While the first and signature pages of the Contract required Plaintiff to sign in acknowledgment of the Arbitration Provision, the Arbitration Provision's title told Plaintiff to "**PLEASE REVIEW – IMPORTANT – AFFECTS YOUR LEGAL RIGHTS**". (*Id.*) (emphasis in original).  Accordingly, there is a valid agreement to arbitrate.

      **b. Enforcement of Arbitration Agreement**

           **i. Relationship Between Arbitration Agreement and Dispute**

In response to Defendants' Motion, Plaintiff argues that the Sale Contract's Arbitration Provision does not cover Plaintiff's claims because they arise out of the separate Maintenance Agreement, which lacks an arbitration clause.  (Opp'n 9). Defendants disagree, contending that Plaintiff's claims arise out of the Sale Agreement or a resulting transaction and that the Sale Agreement incorporates the Maintenance Agreement by reference. (Defs.' Mot. 18–22).  The Court will address these arguments below.

### 1. Arbitration Provision's Express Terms

The Sale Contract's Arbitration Provision—which is broad in scope—provides:

> Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action.

(*Id.* at Neuman Decl. Exhibit A). The Court is convinced that Plaintiff's claims "aris[e] out of or relat[e] to" the Sale Contract or, at a minimum, a "resulting transaction". (*Id.*). Plaintiff's suit stems from her allegation that Defendants "profited from the sale of the Maintenance Plan by collecting more charges on the increased loan amount, monthly payment, and finance charges than they would have received had consumers opted instead to pay for scheduled services individually at the time of those services." (SACAC 6). It is the Sale Contract that financed Plaintiff's purchase of her vehicle and its corresponding Maintenance Plan. (Defs.' Mot. Neuman Decl. Exhibit A) (including Maintenance Plan in "Itemization of the Amount Financed" section); (SACAC Exhibit A) (showing transaction summary as including vehicle for $32,309.00 and prepaid maintenance for $1,025.00). As noted by Defendants, "[t]he price of the [v]ehicle and the Maintenance Plan are, under the Sale Contract, rolled into one amount financed for which Plaintiff agreed to make a single monthly payment." (Defs.' Mot. 18); (SACAC Exhibit A) (totaling monthly payment to $549.33). The terms of this transaction—according to Plaintiff's "Transaction Summary"—are in her "executed installment contract", i.e., the Sale Contract. (*Id.*) (instructing Plaintiff to "[p]lease refer to [her] executed installment contract for the controlling terms of [her] transaction"). This means that whether Defendants overcharged

Plaintiff will depend on the terms of the Sale Contract. Accordingly, Plaintiff's suit arises out of the Sale Contract.[1]

The cases from this Circuit on which Plaintiff relies are distinguishable. First, Plaintiff directs this Court to *Montemayor*. In *Montemayor*, when declining to extend an arbitration provision's reach over the plaintiffs' claims for breach of warranty due to alleged defects in the sports utility vehicle they purchased, the California Court of Appeal's Second District stated:

> Ford contends the Montemayors' claims are inextricably intertwined with the sales contract because the claims concern the condition of the vehicle sold by AutoNation, and the arbitration agreement specifically applies to the purchase and "condition of this vehicle." But this argument conflates the concept of "but for" causation with a determination whether the Montemayors' claims are founded on obligations imposed on Ford under the sales contract. To be sure, the Montemayors would not have sued Ford for the defective condition of the vehicle *but for* the sale of the vehicle by AutoNation pursuant to the sales contract. And Ford provided an express warranty to the Montemayors as a result of the sale. But that does not mean Ford's obligation to provide a non-defective vehicle under its separate express warranty is in any way founded on an obligation imposed by the sales contract or is intertwined with those obligations.

*Montemayor v. Ford Motor Co.*, 92 Cal.App.5th 958, 970 (2023). The Second District came to this conclusion, however, because of the narrow language in the parties' retail installment sale contract. *Id.* at 962. Specifically, the contract disclaimed warranties and stated that the disclaimer did not affect "any warranties covering the vehicle that the vehicle manufacturer may provide". *Id.* The manufacturer could not rely on the contract's arbitration provision—identical to the one at issue here—for the plaintiffs' breach of warranty claim because the contract expressly disclaimed warranties. The Sale Contract includes no such disclaimer and instead describes the financing of the Maintenance Plan.

---

[1] Even granting Plaintiff's premise that the Maintenance Plan is distinct from the Sale Contract, she purchased the Maintenance Plan to upkeep the vehicle that was the subject of the Sale Contract. (SACAC 7). Buying prepaid maintenance requires *first* buying a car to maintain. Therefore, the Maintenance Plan is also a "resulting transaction" of the Sale Contract.

Second, Plaintiff points to *Goodrich* for the proposition that multiple agreements, even if part of the same transaction, may nonetheless be "discrete" and "pertai[n] to different facets of the transactio[n]". *Goodrich Cargo Sys. v. Aero Union Corp.*, 2006 WL 3708065, at *2 (N.D. Cal. Dec. 14, 2006). In *Goodrich*, the "umbrella contract", which "se[t] forth the structure of the entire transaction", did not contain an arbitration clause. *Id.* at *1. Rather, it was an "attachment" to that contract on a sub-issue which required arbitration. *Id.* When declining to extend the arbitration clause to the plaintiff's claims, the district court emphasized that the agreement containing the clause "govern[ed] a *small* aspect of the transaction". *Id.* at *2 (emphasis added). The opposite is true here: the overarching agreement—the Sale Contract—contains the Arbitration Provision. (Defs.' Mot. Neuman Decl. Exhibit A). Located in an "umbrella contract", the Arbitration Provision requires arbitration of any dispute relating to the transaction, including the financing of the Maintenance Plan. *Goodrich*, 2006 WL 3708065, at *1.[2]

Accordingly, the Arbitration Provision's express terms cover Plaintiff's claims, making arbitration appropriate. *Chiron Corp.*, 207 F.3d at 1130.[3]

---

[2] The parties have also cited out-of-Circuit caselaw. (Defs.' Mot. 25–26); (Opp'n 13–14); (Reply 5–6). As between *Rosenblum* (7th Cir.)—relied on by Plaintiff, and *MS Dealer* (11th Cir.)—quoted by Defendant, *MS Dealer* is more on point. In *MS Dealer*, the plaintiff made identical claims to those alleged by Plaintiff: "According to [the plaintiff], MS Dealer improperly cooperated, conspired[,] and otherwise colluded with Jim Burke and Chrysler Credit Corporation in a scheme to defraud her in connection with the purchase of the service contract. She alleges that the $990.00 charge was excessive and that the defendants conspired to charge this excessive amount so that they could each profit from the sale of the service contract by divvying up the excess amount." *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 945 (11th Cir. 1999). The Eleventh Circuit compelled arbitration because the plaintiff's "obligation to pay the $990.00 charge arose under the Buyers Order", which contained the clause. *Id.* at 948. Similarly, Plaintiff's obligation to pay $1,025.00 for the Maintenance Plan arose from the Sale Contract. (Defs.' Mot. Neuman Decl. Exhibit A); (SACAC Exhibit A).

[3] In her Opposition, Plaintiff construes the Arbitration Provision as meaning that "even if claims fall within the purview of the Arbitration Provision, the complaining party can still elect to have the claims heard in court rather than decided by arbitration." (Opp'n 23). The Court disagrees. The Arbitration Provision—according to its plain meaning—does not give the complaining party an absolute right to choose the forum. Rather, it empowers both parties to elect to have "any dispute", irrespective of who commenced proceedings, decided by arbitration. (Defs.' Mot. Neuman Decl. Exhibit A) ("Either you or we may choose to have any dispute between us decided by arbitration and not in court"). If the complaining party sues in a court of law, the defending side may still exercise its right to arbitration.

### 2. Incorporation by Reference

"Under California law, parties to an agreement can incorporate the terms of another document into the agreement by reference." *Pulido v. Caremore Health Plan, Inc.*, 2020 WL 5077353, at *4 (C.D. Cal. May 12, 2020) (internal quotation marks and citation omitted). This means that the document becomes "part of the contract *as if it were recited verbatim.*" *Republic Bank v. Marine Nat. Bank*, 45 Cal.App.4th 919, 921 (1996) (emphasis in original). "For the terms of another document to be incorporated into the document executed by the parties", there is a three-part test: "[(1)] the reference must be clear and unequivocal, [(2)] the reference must be called to the attention of the other party and [s]he must consent thereto, and [(3)] the terms of the incorporated document must be known or easily available to the contracting parties." *Williams Const. Co. v. Standard-Pac. Corp.*, 254 Cal.App.2d 442, 454 (1967).

Regarding the first factor, the Court agrees with Defendants. In the Sale Contract, the Maintenance Plan is referred to as "Service Contract" and "PPM". (Defs.' Mot. Neuman Decl. Exhibit A). "Service Contract" refers to the purpose of the Maintenance Plan—"to cover scheduled services that are ordinarily paid for by Toyota customers at specific mileage intervals"—and "PPM" is an abbreviation of "Pre-Paid Maintenance". (*Id.*); (SACAC 2). These are not vague references, but strong indications that the Sale Contract discusses the Maintenance Plan. Further, under these terms, the Sale Contract expressly states the company that issued the Plan, how long the Plan would last, and its price. (Defs.' Mot. Neuman Decl. Exhibit A). Contrary to Plaintiff's position, the Court finds that the company, term length, and price *clarify* the reference. The descriptions resolve any doubt over what "Service Contract" and "PPM" mean. Because the Sale Contract need not reference the Maintenance Plan numerous times for it to be "clear and unequivocal", *Shaw v. Regents of Univ. of California*, 58 Cal.App.4th 44, 54 (1997)

(finding two references to incorporated document to be "clear and unequivocal"), the first factor supports incorporation by reference.[4]

The second factor requires that Plaintiff consented to the reference of the Maintenance Plan in the Sale Contract. *Williams Const. Co.*, 254 Cal.App.2d at 454. Plaintiff evinced her intent to consent—which is evaluated according to an objective, not subjective standard—by signing directly below the reference. *Shaw*, 58 Cal.App.4th at 54–55 ("[T]he relevant intent is 'objective'—that is, the objective intent as evidenced by the words of the instrument, not a party's subjective intent."); (Defs.' Mot. Neuman Decl. Exhibit A). By signing, Plaintiff acknowledged that she "want[ed] to purchase the service contract(s) written". (*Id.*). Not only did Plaintiff's act of signing indicate her intent, but the requirement that she sign in the first place directed her attention to the reference. *Shaw*, 58 Cal.App.4th at 54 ("The contract need not recite that it incorporates another document, so long as it guide[s] the reader to the incorporated document.") (internal quotation marks and citations omitted) (alteration in original). Therefore, the second factor also supports incorporation by reference.

Finally, as for the third factor, "[w]hether a document purportedly incorporated by reference was 'readily available' is a question of fact." *Baker v. Osborne Dev. Corp.*, 159 Cal.App.4th 884, 895 (2008) (internal citation omitted). Generally, a plaintiff must be able to access the incorporated document to satisfy this element. *Kaba Mas, LLC v. La Gard Latin Am., Inc.*, 2010 WL 11552869, at *3 (C.D. Cal. Dec. 16, 2010) ("Finally, the declaration of the CICA's Chairman . . . establishes that its UNCITRAL rules existed in 2003 . . . Because LGLA could have accessed these rules by contacting the CICA, its argument that the referenced document was unobtainable is unavailing."); *Baker*, 159 Cal.App.4th at 896 ("Here, the trial court found the arbitration provisions were not readily

---

[4] The Court will not respond to Plaintiff's argument about the Maintenance Plan's lack of reference to the Sale Contract because the inquiry is whether the reference to the "the terms of another document to be incorporated into the document executed by the parties" is "clear and unequivocal". *Williams Const. Co.*, 254 Cal.App.2d at 454.

available to the plaintiffs, in that the Warranty Booklet was not provided before or at the time the Builder's Application was presented for signature just before the close of escrow. Substantial evidence supports that finding."). However, Plaintiff knew the Maintenance Plan's terms because they were included in the Sale Contract. (Defs.' Mot. Neuman Decl. Exhibit A). Specifically, the Sale Contract stated that the Maintenance Plan cost $1,025.00 and would last for five years or up to 55,000 miles. (*Id.*). This distinguishes the case from *Baker*, cited above, where the district court's holding hinged on the fact that "[t]he terms of the . . . agreement were not contained in the application." *Baker v. Osborne Dev. Corp.*, 2006 WL 5952768, at *1 (Cal. Super. Dec. 05, 2006) ("Instead, the terms were laid out in documents that had not been presented to the buyers before they signed the application, were not given to them at the time they signed the application, and apparently were not available from the escrow officer or other person supervising the execution of the closing documents."). Further, Plaintiff knew that the Maintenance Plan included ten services, which would occur every 5,000 miles. (SACAC 7–8). She had this information at the time of signing the Sale Contract because she purchased her vehicle and the Maintenance Plan in the same transaction, after the sales representative allegedly convinced her that purchasing the Maintenance Plan was cost-effective. (*Id.*) (alleging that sales representative marketed Maintenance Plan as providing favorable terms); (*Id.* at Exhibit A) (showing transaction summary as including both purchase of vehicle and Maintenance Plan). Accordingly, Plaintiff knew of the Maintenance Plan's terms. The Sale Contract incorporated the Maintenance Plan by reference such that the Arbitration Provision encompasses the dispute at issue. *Chiron Corp.*, 207 F.3d at 1130.

### ii. Unconscionability

Plaintiff argues that even if the *Chiron Corp.* factors are met, the Arbitration Provision should be set aside as procedurally unconscionable "because the Sale Contract requires purchasers to agree to the Arbitration Provision by signing cursory language about arbitration buried in financial information." (Opp'n 24). This argument not only lacks merit but is incomplete. Under California law, "[t]he prevailing view is that [procedural

and substantive unconscionability] must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability". *Fisher v. MoneyGram Int'l, Inc.*, 66 Cal.App.5th 1084, 1093 (2021) (quoting *Carlson v. Home Team Pest Defense, Inc.*, 239 Cal.App.4th 619, 630 (2015)). Plaintiff does not argue that the Arbitration Provision is substantively unconscionable, and the Court fails to see how the Provision "reallocates risks in an objectively unreasonable . . . manner" so as to "shock the conscience." *Baker*, 159 Cal.App.4th at 894 (quoting *Wayne v. Staples, Inc.*, 135 Cal.App.4th 466, 480 (2006)). As a result, the Court will not refuse to enforce the Arbitration Provision on the ground of unconscionability.

### B. Third-Party Defendants' Right to Enforce Arbitration Agreement

The parties agree that Defendants are neither signatories nor third-party beneficiaries to the Sale Contract. (Defs.' Mot. 24); (Opp'n 18–20); (Reply 2 n.2). At issue is whether Defendants may nonetheless compel arbitration under the doctrine of equitable estoppel.

Generally, "only signatories to an arbitration agreement may enforce it." *Victrola 89, LLC v. Jaman Properties 8 LLC*, 46 Cal.App.5th 337, 352 (2020) (quoting *Rowe v. Exline*, 153 Cal.App.4th 1276, 1284 (2007)). However, "a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) (internal citation omitted); *see Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006). Here, the relevant state law is California law.[5]

Under California law, equitable estoppel "precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Id.* (internal quotation marks and citation omitted). In *Kramer*, the Ninth Circuit articulated "two circumstances" in which a non-signatory may enforce an arbitration agreement under the doctrine of equitable estoppel in California, as set forth in *Goldman v. KPMG, LLP*, 92 Cal.Rptr.3d 534, 551 (Cal. Ct. App. 2009):

---

[5] Neither party has requested that this Court apply the law of another State.

> Where a nonsignatory seeks to enforce an arbitration clause, the doctrine of equitable estoppel applies in two circumstances: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement.

*Kramer*, 705 F.3d at 1128–29 (internal quotation marks and citations omitted) (alteration in original); *Boucher v. All. Title Co.*, 127 Cal.App.4th 262, 271 (2005) ("To summarize, under both federal and California decisional authority, a nonsignatory defendant may invoke an arbitration clause to compel a signatory plaintiff to arbitrate its claims when the causes of action against the nonsignatory are 'intimately founded in and intertwined' with the underlying contract obligations."). By contrast, "equitable estoppel is inapplicable where a plaintiff's allegations reveal no claim of any violation of any duty, obligation, term or condition imposed by the [customer] agreements." *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1230 (9th Cir. 2013) (internal quotation marks and citation omitted). Defendants argue that the first circumstance set forth in *Kramer* and *Goldman* is applicable to this dispute. (Defs.' Mot. 24).

    Plaintiff's claims are "intimately founded in and intertwined with" the Sale Contract. *Kramer*, 705 F.3d at 1128. "[I]n order to be intertwined with the [Sale Contract], Plaintiff must allege a violation of a duty, obligation, term or condition imposed by the [Sale Contract]." *Jurosky v. BMW of N. Am., LLC*, 441 F.Supp.3d 963, 970 (S.D. Cal. 2020) (internal quotation marks and citations omitted). Plaintiff alleges she was overcharged for the Maintenance Plan. (SACAC 6). As noted above, *see supra* III.A.b.i.1, the terms of the financing of the Maintenance Plan were in the Sale Contract. "All of her claims against [Defendants]", in fact, "arise out of the [$1,025.00] charge identified in the [Sale Contract] for the [Maintenance Plan]." *MS Dealer*, 177 F.3d at 945 (incorporated into California caselaw in *Metalclad Corp. v. Ventana Env't Organizational P'ship*, 109 Cal.App.4th 1705, 1716 (2003)). Further, Plaintiff's response that "the claims in this case arise out of

the Maintenance Agreement" is moot because the Sale Contract incorporated all the Maintenance Agreement's terms by reference. *See supra* III.A.b.i.2; (Opp'n 22); *Wilson v. Hatch Bank*, 2024 WL 1355492, at *9 (S.D. Cal. Mar. 29, 2024) ("Further, because Wisetack's Privacy Policy, which contains Hatch Bank's Privacy Policy, was incorporated by reference into the TOS, the Court finds Plaintiff not only relied on the terms of the written agreement in asserting her claims against Defendant but also her claims are 'intimately founded in and intertwined with' the underlying contract. Therefore, the doctrine of equitable estoppel applies."). Given that the "linchpin for equitable estoppel is equity—fairness", *Goldman*, 92 Cal.Rptr.3d at 543 (internal quotation marks and citations omitted), the Court will not allow Plaintiff to hold Defendants to the terms of the Sale Contract while ignoring its Arbitration Provision. Defendants, as non-signatories, are entitled to enforce the Arbitration Provision under the doctrine of equitable estoppel.

## IV. CONCLUSION AND ORDER

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Compel Arbitration and **STAYS** the case pending arbitration. *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."); (Defs.' Mot. 28–29) (requesting that this Court stay case).

**IT IS SO ORDERED.**

Dated: December 9, 2024

_____
Hon. Dana M. Sabraw, Chief Judge
United States District Court